UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| LATANYA RODGERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CAUSE NO. 2:12-CV-530 JD |
| | ) |
| GARY COMMUNITY SCHOOL CORPORATION, | ) |
| | ) |
| Defendant. | ) |

# OPINION AND ORDER

This matter is before the Court on the: (1) "Motion for Summary Judgment," filed by Defendant, Gary Community School Corporation, on July 30, 2015 [DE 29]; and (2) "Objection and Motion to Strike Plaintiff S.J. Exhibit A & Plaintiff's S.J. Exhibit B," filed by Defendant, Gary Community School Corporation, on September 16, 2015 [DE 37]. For the reasons set forth below, the Motion for Summary Judgment [DE 29] is **GRANTED IN PART AND DENIED IN PART**. The Motion for Summary Judgment is **GRANTED** as to Counts II and III and the Clerk is **ORDERED** to **DISMISS WITH PREJUDICE** Counts II and III of Plaintiff's complaint. The Motion for Summary Judgment is **DENIED** as to the reasonable accommodation claim under the ADA in Count I, which remains pending. The Objection and Motion to Strike [DE 37] is **DENIED**.

Background

Plaintiff, Latanya Rodgers, has been employed as a custodian by Defendant, the Gary Community School Corporation (hereinafter "GCSC"), since 1995. In September 2011, Rodgers was sexually assaulted by a co-worker who grabbed and kissed her before she was able to

escape. Rodgers claims she suffers from post-traumatic stress disorder as a result of the attack at work. She brings three claims in the current lawsuit: Count I for violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*; Count II for retaliatory harassment and discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5; and Count III for intentional infliction of emotional distress. GCSC has moved for summary judgment on all of Plaintiff's claims.

Undisputed Facts

Rodgers is a custodian with GCSC [Rodgers Dep. at 102]. Her duties include cleaning her assigned area and securing it [*Id.* at 103]. Normally her work schedule is between either 2:30 p.m. to 10:30 p.m. or 2:00 p.m. to 10:00 p.m. [*Id.* at 104]. Her supervisor is Mr. Kenneth Smith, manager over operations [*Id.* at 105].

On September 16, 2011, Rodgers was sexually assaulted by a co-worker while she was cleaning a restroom at the school [Comp. ¶ 1]. After the incident, Rodgers began to suffer panic attacks [Rodgers Dep. at 23]. The employee responsible for the attack was fired by GCSC based upon the incident [*Id.*]. Rodgers was sued by the co-worker in small claims court, she counter sued, and received a judgment against him [*Id.* at 31].

Rodgers filed a workers' compensation claim and received approximately $17,000 for the claim [Rodgers Dep. at 101]. On February 22, 2012 (prior to her returning to work), Plaintiff's workers' compensation mental health treatment provider, Mary Mirro, drafted a letter [DE 32-1]. The letter states that "Ms. Rodgers has been experiencing Post Traumatic Stress Symptoms since the incident." [*Id.*] The mental health treatment provider made several recommendations: (1) there will always be proper lighting in the parking lot and around the school building and

dumpster area; (2) Rodgers or any custodial staff member should never be left alone in the school building; (3) the custodial staff should work together as a team, for example, walk each other out to the parking lot at the end of the shift; and (4) no person should take the garbage out by themselves [DE 32-1].  According to Rodgers, her doctor wrote out the requested accommodations, and "submitted those to, you know, my building people." [Rodgers Dep. at 79.]  Rodgers testified during her deposition that no one from GCSC ever sat down with her and discussed the recommendations of Mirro dated February 20, 2012 [*Id.* at 174-75].

Dr. Michael Kovacich issued Rodgers a doctor's note stating she "has been under my care and has been released as of April 16, 2012." [DE 30-5.]  She felt forced to return to work after Rodgers received a phone call from Defendant's administrative personnel advising her that her benefits would be terminated if she did not return to work [Rodgers Dep. at 51-52].  On April 16, 2012, Rodgers returned to work and has been working full-time as a custodian until the present [*Id.* at 53].

On May 7, 2012, Rodgers' workers' compensation treatment provider drafted a second, more detailed letter to GCSC saying Rodgers was referred to her by Lynn Karfomenos, a medical case manager, nurse life care planner, and legal nurse consultant, and Mirro "concurred with the diagnosis that was made from the EAP counseling service, Post Traumatic Stress Disorder (PTSD)." [DE 32-2.]  Mirro also stated in the letter that on January 20, 2012, Rodgers presented as being "anxious, withdrawn and fearful." [*Id.*]  Mirro saw Rodgers twice during the week of April 30, 2012, and the provider reported that "[a]lthough she feels very frustrated and angry about the Gary School Corporation and how she has been treated, I believe that Ms. Rodgers is realizing that she is stronger than she thought.  I encouraged her to return to work and

3

do the best that she could. She agreed to do so." [DE 32-2 at 2.]

Rodgers testified during her deposition that GCSC did not consistently accomplish Mirro's requested accommodations. Specifically, she said about the school parking lot that "they finally got some of the lights to work. They worked for a moment, but then they went out." [Rodgers Dep. at 176.] Ultimately, Rodgers said there was not a resolution to the lighting issue [*Id.* at 177]. Rodgers also testified that the teamwork approach was never really implemented, and there was no additional training for the custodial staff [*Id.* at 178-79]. After she returned to work, Rodgers was put in a position where she was expected to take the garbage out by herself [*Id.* at 179].

Rodgers gave deposition testimony that after the assault on September 11, 2011, she was diagnosed by a GCSC doctor with high blood pressure, anxiety, panic attacks, syncopal stress, and post-traumatic stress disorder, which she claims affect her daily life [Rodgers Dep. at 87-99, 157-59, 166-67]. She claims her conditions often prevent her from being able to think clearly, to concentrate, they disrupt her sleep, and have affected her ability to interact and communicate normally with other people [*Id.* at 7, 163-64, 166-67]. Rodgers testified that she suffered an episode of stress-related syncope and high blood pressure shortly after she returned to work, and the episode resulted in Rodgers being transported to the hospital [*Id.* at 68-69, 184-85]. Rodgers was seen and treated in the emergency department on April 25, 2012, and was released with the direction that "she may return to work in 3 days." [DE 30-3.]

Rodgers filed a charge of discrimination with the Gary Human Relations Commission and the Equal Employment Opportunity Commission ("EEOC") dated May 23, 2012 [DE 30-1]. She received a right to sue notice from the EEOC on September 24, 2014 [Compl. ¶ 2]. The

complaint also alleges that Rodgers was "denied a promotion or hiring to which she would have been entitled." [*Id.* ¶ 18.]

Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

A party opposing a properly supported summary judgment motion may not rely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

I.      Motion to Strike

Preliminarily, the Court must address GCSC's objection and motion to strike Plaintiff's Summary Judgment Exhibit A (a letter from Mary Mirro, Plaintiff's workers' compensation mental health treatment provider, dated February 22, 2012), and Plaintiff's Summary Judgment Exhibit B (a letter from Mary Mirro dated May 7, 2012). GCSC argues the exhibits must be excluded because Rodgers should have disclosed the identity of an expert and an expert report, and because they are unauthenticated, contain hearsay, and have inconsistent and confusing dates.

Exhibit A is a letter from Mary Mirro that is dated February 22, 2012, and yet confusingly refers to "the incident" at school occurring "last September 2012." [DE 32-1]. Plaintiff responds that Rodgers testified about this document during her deposition with enough specificity to render it admissible, and that the reference to the incident occurring in September 2012 "is clearly a typographical error by the author of the document." [DE 41 at 3-4.] Additionally, Plaintiff contends that "[i]ssues concerning relevancy of exhibits, expert witness status, hearsay contained within exhibits, and lack of proper foundation could easily have been discussed and resolved by the parties even during the course of the deposition itself," and argues that because Defendant failed to raise these issues then, it has waived its right to now object. [*Id.* at 8.]

Exhibit B is another letter from Mary Mirro that is dated May 7, 2012, but oddly not signed by Mirro until September 10, 2012 [DE 32-2]. Plaintiff urges that the "inconsistency has nothing to do with relevance whatsoever." [DE 41 at 4.]

With regard to a motion for summary judgment, "[a] party may object that the material

6

cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). "In other words, the Court must determine whether the material can be presented in a form that would be admissible at trial, not whether the material is admissible in its present form." *Stevens v. Interactive Fin. Advisors, Inc.*, No. 11 C 2223, 2015 WL 791384, at *2 (N.D. Ill. Feb. 24, 2015). As the Seventh Circuit has specifically noted, "the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) (emphasis in original). Therefore, to the extent the motion to strike challenges the exhibits as containing hearsay, that objection is denied as Rodgers should be granted an opportunity to attempt to present those facts at trial in an admissible form.

Regarding authentication, the Federal Rules of Evidence provide that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Proper authentication methods include, *inter alia,* testimony of a witness with knowledge. Fed. R. Evid. 901(b)(1). "Rule 901 requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence." *United States v. Harvey*, 117 F3d 1044, 1049 (7th Cir. 1997). In this case, to the extent GCSC challenges the authenticity of Exhibits A and B, the motion to strike is denied. *See, e.g., United States v. Brown*, 688 F.2d 1112, 1116 (7th Cir. 1982) (finding the "very act of production was implicit authentication."); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 556 F.Supp.2d 941, 948 (W.D. Wis. 2008) (rejecting authenticity challenge at summary judgment as disingenuous where the challenged e-mails "were documents produced by defendant

7

during discovery"). Rodgers gave substantial testimony during her deposition to satisfy the requirements of Rule 901 [Rodgers Dep. at 183-87]. Consequently, the exhibits will not be excluded on the basis of authenticity.

GCSC also objects to these two exhibits because Plaintiff has not disclosed any expert opinions or submitted any expert reports. "[A] party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A). However, only those retained or specially employed to provide expert testimony must submit an expert report complying with Rule 26(a)(2)(B). Fed. R. Civ. P 26(a)(2)(B). Rodgers contends Mirro is a treating physician and the exhibits merely contain her conclusions and recommendations. [DE 41 at 6-7.] In this case, it seems that Mirro was not retained or employed to provide expert testimony - she was the workers' compensation therapy provider. *See Zurba v. United States*, 202 F.R.D. 590, 591-92 (N.D. Ill. 2011) (citing *Richardson v. Consolidated Rail Corp.*, 17 F.3d 213, 218 (7th Cir. 1994)) ("a treating physician is not considered a retained expert for purposes of Rule 26(a)(2) and thus need not submit a report, if his testimony is based on observations made during the course of treatment, the testimony was not acquired or developed in anticipation of litigation or for trial, and the testimony is based on personal knowledge."). Therefore, Rodgers did not need to file an expert report for Mirro.

The Court notes that if Plaintiff intends to use either Mirro or the EAP counselor as an expert in her case at trial, Plaintiff should have disclosed those individuals. *See* Fed. R. Civ. P. 26(a)(2)(C) (requiring a witness who is expected to present evidence under Federal Rule of Evidence 702, 703, or 705, who does not provide a written report, to still disclose the subject

matter on which the witness is expected to present evidence and a summary of the facts and opinions to which the witness is expected to testify). Plaintiff is reminded about the duty of this disclosure and that at trial, Plaintiff will have to qualify individuals as experts and satisfy the elements of Rule 702 admissibility by laying a foundation for such opinions.

Motions to strike are heavily disfavored, and usually only granted in circumstances where the contested evidence causes prejudice to the moving party. *Kuntzman v. Wal-Mart*, 673 F.Supp.2d 690, 695 (N.D. Ind. 2009); *Gaskin v. Sharp Elec. Corp.*, No. 2:05-CV-303, 2007 WL 2228594, at *1 (N.D. Ind. July 30, 2007) ("In general, motions to strike are disfavored."). Here, the Court follows the permissive language in *Olson*, 750 F.3d at 714, and grants Plaintiff the opportunity to oppose summary judgment with materials that are currently inadmissible because she can later present them at trial in an admissible form. Therefore, the motion to strike [DE 37] is **DENIED.**

II.  Motion for Summary Judgment

GCSC first argues that Rodgers failed to exhaust her administrative remedies [DE 30 at 5]. To bring a claim under the ADA, a plaintiff must first file a charge alleging the unlawful employment practice with the EEOC and receive notice of a right to sue. *See* 42 U.S.C. § 12117(a). Generally, a plaintiff cannot file claims in a court of law that were not included in the EEOC charge. *See Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994); *see also Rush v. McDonald's Corp*., 966 F.2d 1104, 1110 (7th Cir. 1992) ("[a]n aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination.").

However, an ADA plaintiff may bring a claim not included in the EEOC charge "if there

9

is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claims in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Cheek*, 31 F.3d at 500. Courts apply a liberal reading of EEOC charges. *Roesel v. Joliet Wrought Washer Co.*, 596 F.2d 183, 187 (7th Cir. 1979) ("Courts have consistently required a liberal reading of EEOC charges and have allowed subsequent judicial proceedings to encompass any discrimination reasonably related to the charge."); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 866 (7th Cir. 1985) (EEOC charges are "to be construed with utmost liberality."). Furthermore, Rodgers was pro se when she filed her EEOC charge of discrimination,

Rodgers alleges in the EEOC charge that she was sexually assaulted at work on September 16, 2011, she was harassed and denied terms and conditions of employment by GCSC, she was forced to return to work, she was denied "reasonable accommodations," and she was denied a position that she believed she was entitled to based upon seniority. [DE 30-1.] In this case, the complaint and the EEOC charge are both based upon a single precipitating incident (the sexual assault at work), and they both involve the same conduct, same individuals, and decisions by the same people. The claims Rodgers lists in the charge for discrimination are reasonably related to the charges in the complaint. Thus, she is not procedurally barred from bringing her claims.

    1.    <u>ADA Claim</u>

Count I of the complaint alleges that "GCSC has failed to consistently provide [ ] reasonable accommodations" in violation of the ADA. [DE 30-2 at 4.] The ADA prohibits employers from discriminating against their employees "on the basis of disability." 42 U.S.C. §

12112(a); *see also Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 706 (7th Cir. 2015). To establish a violation of the ADA, an employee must show that: (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the employer took adverse action because of her disability or failed to make a reasonable accommodation. *Winsley v. Cook Cnty.*, 563 F.3d 598, 603 (7th Cir. 2009).[1] To establish a prima facie case for failure to accommodate, Rodgers must show that: (1) she is a qualified individual with a disability; (2) GCSC was aware of her disability; and (3) GCSC failed to reasonably accommodate the disability. *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011).

One is "disabled" under the ADA if she has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment. 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g); *see also Carothers v. County of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015). The ADA defines "major life activities" as including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Additionally, the EEOC regulations add to the list of major life activities sitting, reaching, and "interacting with others." 29 C.F.R. § 1630.2(i)(1)(i).

According to the recent Code of Federal Regulations ("C.F.R."), the term substantially limits "is not meant to be a demanding standard" and determining "whether an impairment

---

[1] The Court notes that Congress amended the ADA, effective January 1, 2009, to broaden the class of individuals who qualify as "disabled" under the statute. Pub. L. No. 110-325, 112 Stat. 3553. Although the amendments are not retroactive, *see Winsley*, 563 F.3d at 600 n.1, because the alleged discriminatory actions in this case occurred after 2009, the ADA amendments apply to Rodgers' claims.

11

'substantially limits' a major life activity should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(i) and (iii). The regulations further provide that the "term 'substantially limits' shall be construed broadly and in favor of expansive coverage[.]" 29 C.F.R. § 1630.2(j)(1)(i). In arguing that she fits the statutory definition of "disabled," Rodgers contends that her condition of post-traumatic stress disorder substantially limits the following major life activities: sleeping, thinking, concentrating, interacting with people, and communicating. [DE 31 at 13.]

Although neither party brought this regulation to the Court's attention, there is a recent regulation that lists post-traumatic stress disorder as an impairment that will "virtually always be found to impose a substantial limitation on a major life activity." 29 C.F.R. § 1630.2(j)(3)(ii). Indeed, the regulation expressly states that "it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . post-traumatic stress disorder . . . substantially limit[s] brain function." 29 C.F.R. § 1630.2(j)(3)(iii). Keeping in mind this regulation and the ADA amendments which were enacted to ensure broad coverage, the Court turns to analyzing whether Rodgers' post-traumatic stress syndrome substantially limits a major life activity.

In her statement of additional undisputed facts, Rodgers states her "conditions often prevent her from being able to think clearly or concentrate, disrupt her sleep, and have affected her ability to interact and communicate normally with other people" and then cites to specific pages and lines in her deposition. [DE 31 at 5.] The Court has carefully reviewed these portions of Rodgers' deposition cited in support of her claim that she is substantially limited in a major life activity and recites below the pertinent excerpts:

- Rodgers testified that her medication makes it "hard to kind of think." [Rodgers Dep. at 7.]

- Rodgers testified that "it's hard to concentrate from going through all this paperwork and trying to keep up with everything – when I get a lot of paperwork, I get sick. I don't want to go through it. It's hard to go through . . . everything's got to be written down now. It's like I can't even put that in my memory. . . . And then if something throws me off, I walk in circles. It takes me a moment to regroup . . . . I think I got a little meaner." [*Id.* at 166-67.]

- Rodgers testified that "the damages that I incurred through this was fear, my relationship with my husband changed, the intimidations that I used to have with being around a man, and since [ ] grabbed me from behind, I'm not good with people standing behind me no more. My health condition has changed. I never had anxieties and all that stress issue. No. I never had those kinds of – where I get those tensions and stuff in my neck and my body. I never had that – go through that since the incident happened. It's messed with my character. When I work with my peers, they don't – they don't interact with me anymore." [*Id.* at 163-64.]

- As an example of Rodgers "difficulty organizing and communicating her thoughts" [DE 31 at 5], Plaintiff cites the following portion of the deposition in response to the question "when was George Neal your supervisor?" Rodgers answered: "Now, I don't want to give you - - I don't know what date that he - - because we lost Mr. Neal - - he's no longer with us, and Mr. Neal - - okay - - I got assaulted - - so I'm thinking - - now this is just a random thinking because I can't really give you a specific date of his - - it changing over from - - Mr. Smith kind of took over - - I'm thinking that Mr. Smith took over in 2010 - - 2010 - - '10 or '11 - - no. I know he was here in '11, so it had to be 2009 or 2010 - - in one of those, I think, Mr. Smith took over." [*Id.* at 21-22.]

In addition to Rodgers' deposition testimony, on February 22, 2012, her workers' compensation treatment provider, Mirro, stated that "Ms. Rodgers has been experiencing Post Traumatic Stress Symptoms since the incident." [DE 32-1.] Finally, in a letter dated May 7, 2012, Mirro stated she "concurred with the diagnosis that was made from the EAP counseling service, Post Traumatic Stress Disorder (PTSD)." [DE 32-2.]

Viewing the facts relevant to Rodgers' condition in the light most favorable to her, and assessing those facts under the new, less stringent analysis called for by the ADA amendments, there is sufficient evidence to permit a reasonable jury to find that Rodgers has a disability under the ADA. This conclusion is supported by the regulation providing post-traumatic stress

disorder should virtually always be found to impose a substantial limitation on a major life activity, the Mirro letters, Rodgers' deposition testimony, as well as the fact that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." 29 C.F.R. § 1630.2(j)(1)(iii).

Rodgers must also establish that she is a "qualified individual" under the ADA, which is defined as an individual with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). GCSC largely argues that Rodgers was not a qualified individual with a disability because "she is capable of performing, and does perform, her job as a janitor." [DE 30 at 12.] This argument, while directed more towards whether Rodgers is disabled, basically concedes that Rodgers can perform the essential functions of her position, with or without a reasonable accommodation.

The ADA requires an employer to engage in an interactive process with a qualified individual to determine whether a reasonable accommodation will allow her to work. *Beck v. University of Wisconsin Bd. Of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). If a reasonable accommodation is available, an employer who does not provide it to an employee with a disability violates the ADA unless it can demonstrate that the accommodation would impose an undue hardship on its business operations. *Id.* at 1134. Additionally, "[b]y the statutory language, 'reasonable accommodation' is limited by the employer's knowledge of the disability." *Beck*, 75 F.3d at 1135 (citing *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928 (7th Cir.

14

1995)). "An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations." *Beck*, 75 F.3d at 1134. In its reply memorandum, GCSC argues that nowhere in Plaintiff's EEOC charge of discrimination does Rodgers indicate there were medical doctors or psychiatrists who demanded any type of accommodations for Rodgers, and that Rodgers indicated on the charge that the latest date of discrimination was April 25, 2012. [DE 38 at 5-7.] However, Rodgers indicated that there was "continuing action" on the charge of discrimination [DE 30-1], and as noted earlier in this decision, courts apply a liberal reading to EEOC charges. *See, e.g., Rosesel*, 596 F.2d at 187. Additionally, Plaintiff states in her uncontested facts section that her doctor, Mirro, wrote out the requested accommodations, and "submitted those to, you know, my building people." [Rodgers Dep. at 79.] While GCSC faults the Mirro letters for not being addressed to anyone specific, GCSC has not pointed to any evidence in the record that contradicts Rodgers' assertion that the Mirro letter with the requested accommodations was submitted to someone at GCSC. GCSC also contends that because Dr. Kovacich signed a work release for Rodgers dated April 16, 2012, GCSC did not know Rodgers needed any accommodations. [DE 38 at 6-7.] But just because a doctor releases a patient to work does not mean that employee cannot still have a disability that requires accommodation. Upon balance, there is a disputed question of fact as to whether GCSC knew of Rodgers' disability.

Similarly, there is also a genuine dispute as to whether GCSC was involved in an interactive process with Rodgers, and whether it provided Rodgers with reasonable accommodations. The federal regulations implementing the ADA state: "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an

15

informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). Yet, this is a two-way street, and the regulations state the "appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. 1630, app. As the Seventh Circuit described in *Beck*, "[n]o hard and fast rule will suffice because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Beck*, 75 F.3d at 1135. In this case, Rodgers testified that no one from GCSC ever sat down with her and discussed the recommendations of Mirro dated February 20, 2012. [*Id.* at 174-75.] Yet, GCSC claims that Plaintiff had a procedure to follow, but did not file any grievances with GCSC. **[**DE 38 at 7-8.**]** Moreover, Rodgers testified that the requested accommodations (better lighting, no employee should ever be left alone in the building, the custodial staff should work as a team, and no person should ever take out the garbage by themselves), were not consistently implemented. [Rodgers Dep. at 176-79.] In response, GCSC claims most of the issues were resolved due to the practice of the employees, and lights were replaced. [DE 38 at 7-8.] The Court finds too many disputed issues of material fact exist, rendering summary judgment inappropriate on the ADA reasonable accommodation claim in Count I.

To the extent Count I also attempts to state a claim for discrimination or harassment under the ADA [Compl. ¶ 17], GCSC argues in its memorandum in support of summary judgment that Rodgers could not establish a prima facie case of discrimination, she did not

16

receive any adverse employment actions, and she has no evidence demonstrating GCSC's legitimate nondiscriminatory reasons for its actions were pretextual. [DE 30 at 15-16.] Rodgers fails to address these arguments in her response brief, and fails to present any evidence to the Court that she was the subject of any type of harassment. Indeed, Rodgers seems to concede she has given up any claim for harassment or discrimination under the ADA, as she states that "Defendant's failure to make reasonable accommodations is sufficient to establish liability on the part of Defendant, even in the absence of an adverse employment action." [DE 31 at 15.] Because Rodgers has not advanced any argument in support of the allegation in Count I of the complaint that she suffered harassment or discrimination in violation of the ADA, it is therefore deemed waived. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) ("because [plaintiff] failed to delineate his negligence claim in his district court brief in opposition to summary judgment or in his brief to this Court, his negligence claim is deemed abandoned"); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the district court in response to summary judgment motions are deemed waived).

    2.    <u>Title VII Claim</u>

Rodgers also claims that GCSC violated Title VII's anti-retaliation provisions. Title VII provides that an employer may not "discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a Title VII retaliation claim, Rodgers must prove that: (1) she engaged in activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there is a causal nexus between her protected action and the adverse employment action. *Smart v. Ball State Univ.*, 89 F.3d 437, 440

(7th Cir. 1996) (quotation omitted); *see also McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996). A plaintiff can prove the "causal link" by demonstrating that her employer would not have acted adversely "but for" the protected expression. *McKenzie*, 92 F.3d at 483 (quoting *Klein v. Trustees of Indiana Univ.*, 766 F.2d 275, 280 (7th Cir. 1985)).

Rodgers clearly satisfies the first element because filing an EEOC complaint is protected activity. She does not, however, satisfy the second step that she has suffered an adverse employment action. To the extent Rodgers contends that GCSC retaliated against her by denying her requests for accommodation, this is "insufficient to serve as a stand-alone retaliation claim because these allegations merely restate Count I." *Pack v. Illinois Dep't of Healthcare and Family Serv.*, No. 13-cv-8930, 2014 WL 3704917, at *4 (N.D. Ill. July 25, 2014).

In Rodgers' complaint, she alleges she was "denied a promotion or hiring to which she would have been entitled." [Compl. ¶ 18.] GCSC argues that it took no adverse job action against Rodgers, and that it was entitled to summary judgment on this count. [DE 30 at 14-15.] Rodgers does not advance any argument in her response in opposition to the motion for summary judgment; therefore, this claim is also deemed abandoned and waived. *See Palmer*, 327 F.3d at 597-98; *Caruso*, 197 F.3d at 1197.

Even assuming, *arguendo,* she did not waive the argument, it would still fail because Rodgers has produced no evidence of an adverse employment action - she has failed to give the Court any particular details or facts about when or how she was allegedly denied a promotion to which she was entitled. Moreover, "[n]ot everything that makes an employee unhappy is an actionable adverse action. Negative performance reviews, a change in job title, an increased travel distance to work, do not by themselves qualify. . . . To be actionable, there must be a

'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Stutler v. Illinois Dept. Of Corrections*, 263 F.3d 698, 703 (7th Cir. 2001) (quoting *Bell v. Envtl. Prot. Agency*, 232 F.3d 546, 555 (7th Cir. 2000)). Rodgers has not provided any evidence that she suffered an actionable, adverse employment action. Therefore, summary judgment is warranted on Count II.

      3.      <u>Intentional Infliction of Emotional Distress</u>

Rodgers also states a count for intentional infliction of emotional distress (Count III). As with Count II, Plaintiff completely fails to address GCSC's argument that summary judgment is appropriate on this count. Therefore, the claim for intentional infliction of emotional distress is waived. *See Palmer*, 327 F.3d at 597-98; *Caruso*, 197 F.3d at 1197.

Even if Rodgers had not waived this claim, it would still fail. Count III alleges that GCSC "intentionally, recklessly and/or negligently inflicted severe and prolonged emotional distress upon Rodgers by and through its harassment and discrimination of Rodgers through the term and duration of Rodgers' employment with GCSC." [Compl. at 8.] The ITCA provides that a claim against a political subdivision is barred unless the prescribed notice is filed within 180 days after the loss occurs. Ind. Code 34-13-3-8; *see also Davidson v. Perron*, 716 N.E.2d 29, 33-34 (Ind. Ct. App. 1999). Specifically, notice must be filed: (1) with the governing body of that political subdivision; and (2) the Indiana Political Subdivision Risk Management Commission. Ind. Code 34-13-3-8. "The notice requirements of the ITCA apply not only to suits against political subdivisions but also to suits against employees of political subdivisions." *Davidson*, 716 N.E.2d at 33-34 (citing *VanValkenburg v. Warner*, 602 N.E.2d 1046, 1048 (Ind.

Ct. App. 1992)). The claimant bears the burden of establishing substantial compliance with the notice provisions and it is a question of law. *Chang v. Purdue Univ.*, 985 N.E.2d 35, 52 (Ind. Ct. App. 2013). In this case, Rodgers has not responded to GCSC's argument that she did not file the required notice. As such, Rodgers has failed to carry her burden of establishing compliance with the ITCA notice requirements, and summary judgment is proper on this claim.

## Conclusion

For the reasons set forth above, the Motion for Summary Judgment [DE 29] is **GRANTED IN PART AND DENIED IN PART**. The Motion for Summary Judgment is **GRANTED** as to Counts II and III and the Clerk is **ORDERED** to **DISMISS WITH PREJUDICE** Counts II and III of Plaintiff's complaint. The Motion for Summary Judgment is **DENIED** as to the reasonable accommodation claim under the ADA in Count I, which remains pending. The Objection and Motion to Strike [DE 37] is **DENIED**.

SO ORDERED.

ENTERED: March 1, 2016

/s/ JON E. DEGUILIO
Judge
United States District Court